## Jacob P. Rust *versus* Boston Mill Corporation.

An ancient book of records of the town of Boston, entitled the Book of Possessions which, although not regularly authenticated, has been preserved among the re-cords of the town, was held (there being nothing to impeach its verity) competent and sufficient evidence to establish the ancient titles under allotments from the town.

The owner of land bordering on a cove where the sea ebbs and flows, who is enti-tled, under the colony ordinance of 1641, to the adjoining flats " to the low-water mark," cannot always claim the flats in the direction of the exterior lines of his upland, but only in the direction towards low-water mark from the two corners of his upland at high-water mark.

Thus in the case of a circular cove in which there is no natural channel, if a straight line across the mouth of the cove is 100 rods in length and the circular line of high-water mark is 200, each owner of a lot abutting on the cove is entitled to run his lines from the two corners of his lot in a direction towards low-water mark, so as to include a parcel of flats, which at the mouth of the cove will be one half the width of the lot at high-water mark ; and thus each will hold his share in severalty.

In the case of an ancient grant of " all that cove, *already bounded*," &c. it was held, that in the absence of all proof of ancient bounds supposed to be-referred to, the grant must operate according to the general description of the estate granted.

In a writ of entry, upon the question whether the grantees of a cove, under whom the tenants derived their title, had ever claimed or taken possession of flats outside of a certain line, the tenants were permitted to give in evidence an ancient deed under which possession had been taken and continued to the present time, from such grantees to a third person, of a part of the flats so situated.

*Writ of entry*, demanding possession of certain land, for-merly flats in the mill pond cove, in Boston.   Plea, *nul dis-seisin*.   Trial before *Parker* C. J.

The demandant, to trace his title prior to the year 1643, produced an ancient book of records of the town of Boston, entitled the Book of Possessions, which he contended was made pursuant to an ordinance of the colony in 1634.   This book was in the case for the consideration of the whole Court. The causey therein referred to, was admitted to be the an-cient way leading from Cross street towards Charlestown, in the direction of Snow Hill street, this way having long since been covered by the mill pond.

The possessions relied on as embracing the estate in suit, were Thomas Buttolph's, William Copp's and John Button's

The allotment to Buttolph, the demandant contended, was between Snow Hill street and the North Mills, bounding on

tne marsh afterwards covered by the pond.  He contended that these possessions embraced all the upland from Snow Hill street ro·nd as far at least as Charles River bridge ; and that those o˙ Copp and Button, bounding northwesterly and northerly oy Charles river, included the flats in front of them, under and by virtue of the colony law of 1641.

The demandant did not deduce a connected title to himself from Copp, Button or Buttolph ; but he contended that these persons, or some one of them, being the owners of the estate in question before 1643, it would be sufficient for him to show that he, and those under whom he claims, had been in possession of the estate for such a length of time as to raise a presumption that they had acquired a title by grant from the former owners ; and that at any rate this was sufficient to rebut any claim of the tenants under a supposed grant of the town in 1643, the town having at that time no right to grant the same.  He then attempted to show, that he, and those under whom he claims, had been in possession of the estate, claiming title thereto, for more than 120 years.  For that purpose he read in evidence various deeds and depositions ; and likewise exhibited a plan of the town of Boston, made in 1722, in which the ship-yard of Joshua Gee (through whom the demandant claims) corresponds with the present upland of the demandant.  In conveyances since 1750, of different parcels of the land which belonged to Gee, they are described as bounded " by the sea or salt water with the flats," — " on the mill stream," — " on the mill cove or salt water," — " on mill creek or flats, so called."

There was much evidence on both sides in respect to the occupation by the parties, of the flats in question.

On the part of the tenants it was proved, that the town of Boston, on the 31st of 5th month, 1643, made to Henry Simonds and others, a grant of all that cove, *already bounded*, on the northwest side of the causey leading towards Charlestown, with all the salt marsh bordering thereupon round about, not formerly granted to any others, on certain terms and conditions ; which grant was in the case.  On the 27th of 9th month, 1643, at a meeting of the selectmen, the intent of the agreement between the town and the grantees of the cove, &c

Rust
*v.*
Boston Mill
Corporation.

160

for the mill, was declared ; and this declaration was in the case.

It was admitted, that the tenants have now whatever estate was conveyed by the grant to Simonds and others, except such parts thereof as the grantees or their assigns have since transferred to other persons, unless they have lost the same by forfeiture or otherwise.

A copy of a deed from the mill proprietors in 1735 to Waldo and Cook was offered in evidence by the tenants, showing that at that time the mill proprietors claimed the flats outside of the mill dam. This, however, was objected to by the demandant, as not legal evidence, but was admitted by the judge. It was conceded'that the grantees entered and took possession, and that the land and flats conveyed are now held under the deed.

The tenants then gave in evidence the indenture between the town of Boston and themselves, in 1807, in which the original grant to Simonds and others is referred to as embracing the flats on both sides of the dam, and the town release to the tenants all the conditions contained in that grant, and all the right and interest of the town in the mill pond, and in the flats on the outside of the dam, to the same properly belonging.

The course of the ancient causeway mentioned in the grant to Simonds and others, was delineated on the plans used on the trial, and also the course of the old mill dam. This dam the demandant contended should be considered as a boundary, fixed by the grantees at the time of the grant or very soon afterward, showing what they then understood to be the extent of their grant. The plan of the town in 1722 was also exhibited by the demandant, as showing certain projections from the shore, near the ends of the dam, and which were, as he contended, the " spits " referred to in the explanatory grant above mentioned.

It appeared from the plans used in the case, and also from the testimony of the surveyors, that the line of low-water mark was a considerable distance northerly, outside of the flats claimed in this suit, and nearly parallel therewith. But the flats claimed are within the exterior lines of the demand

ant's upland continued westerly. And he contended that. he had a right by law to all the flats in front of his upland, to such a distance outward as not to interfere with the rights of those on the opposite shore, and not to obstruct the passage of the owners of land within the cove to the main channel, and that all the proprietors round the cove, instead of going in the nearest direction to low-water mark, should go towards a common centre, leaving a sufficient space for a common passage to low-water mark.

The number of feet round the shore of the cove, as claimed by the tenants and as the shore now exists, and the number of feet across, was ascertained. Also the length of the demandant's line of upland, and the number cf feet occupied by him on the line of low-water mark. It appeared, that if the whole flats were apportioned among the different proprietors, so as to give to each such a number of feet on the line of low-water mark, as would belong to him according to the length of his line of upland, the demandant had already more than his share.

Upon the facts in the case, the judge charged the jury, that it was not proved by the demandant, t'at the upland now owned by him was granted to Copp and others before 1643, or that the land so granted had come to the demandant derivatively from the original grantees, yet that both these points were matters to be judged of by the jury ; the first from the Book of Possessions itself, and the second from the presumption of grants which had been lost. But he further instructed them, that it was immaterial whether they were satisfied upon these points or not, inasmuch as he was of opinion, that the demandant could not recover the flats claimed by him as appurtenant to his upland, under the colony ordinance of 1641, because they did not lie in the direction from the upland towards low-water mark ; and that where the upland was so situated that the owner could not claim them in that direction, he would have no right to any flats under that ordinance ; that whether the abutters round a circular cove would take the flats within the cove as tenants in common, in proportion to the extent of their upland, or whether each man would take in severalty such just proportion as might belong to him, was of no importance in this action, for the demandant could not re-

Rust
v.
Boston Mill
Corpora-
tion.

cover as tenant in common, his proportion not being ascertained, nor any attempt made to show what his proportion was, nor any claim made by him as tenant in common ; and if he owned in severalty a certain portion, he had got already more than his share.

The judge further instructed the jury, that in his opinion, the grant to Simonds and others embraced such a length of time as to have given them a title ; that in respect to the demandant, he having proved that Paine and Adams, under whom he claims, had been in the possession of a wharf, and of the flats necessary for the enjoyment of it, for more than forty years, he was now entitled to the flats to that extent, but no further. The jury were accordingly directed to ascertain the outward line of the wharf, and to allow the demandant as great a distance outside of that line, as would be sufficient to accommodate such vessels as usually came to the wharf, allowing room enough for two vessels to lie abreast, or at farthest for one to turn round. The jury fixed the boundary line accordingly, and found that the tenants had disseised the demandant of all the demanded premises within that line, and had not disseised him of the residue.

The demandant moved for a new trial for the following reasons : —

1. Because the judge instructed the jury, that it was immaterial for them to consider whether the demandant had or had not proved, that certain persons under whom he claims, were seised of the flats appurtenant to his upland, before the year 1643, because he was of opinion, that if the demandant was entitled to any flats by virtue of the colony ordinance of 1641, he was not entitled to claim them in the direction of the exterior lines of his upland, but only in the direction to low-water mark.

2. Because he omitted to instruct the jury, that the demandant having shown that he and those under whom he claims, had been seised of the upland, from the North Mills to Charlestown ferry-way, for more than a hundred years, and had been in the constant and uninterrupted use of the flats adjacent, for the accommodation of shipping and other marine purposes, the demandant had acquired a title by prescription,

and by the laws and usages of this Commonwealth, to all the flats lying before his upland and within the exterior bounds thereof, continued so far out as any one by law had a right to go ; and that therefore the town of Boston, even if they once owned these flats, had lost their right to the same long before the year 1807, and had no right to grant them at that time ; and that whatever rights the mill owners might have had to the same under the grant in 1643, they also had long since lost the same, and by voluntarily abandoning their mill privileges, abandoned also any easement they might have had over the flats outside of the dam, for the influx and efflux of water into and out of their mill pond ; leaving the flats as the property of the owners of the adjoining upland, unincumbered of any such easement. [The judge was not requested to charge the jury upon this or any other point.]

3. Because the judge instructed the jury, that by the terms of the grant to Simonds and others in 1643, " of all that cove on the northwest side of the causey leading to Charlestown," the grantees were entitled to all the flats included within a line drawn from the extreme projections at Barton's Point (on the westerly side of the cove) and the outer part of what was formerly Gee's ship-yard ; and that the terms " already bounded," did not limit the grant to the land and flats within the mill dam.

4. Because he instructed the jury, that the particular location of the mill dam, at the time of, or soon after the grant, could not be considered as amounting to a contemporaneous construction of the extent of the grant.

5. Because the judge admitted the deed from the mill proprietors to Waldo and Cook in 1735, to be read in evidence to the jury, to show their construction of the terms of their grant, though the subject matter of that deed related to flats at the extreme westerly end of the mill dam, and did not affect the estate claimed by the demandant, and no other instance of such construction was proved till the release by the town of Boston in 1807.

6. Because the judge instructed the jury, that if the flats outside the mill dam, of which the demanded premises make a part, were not included in the grant to Simonds and others in

Rust
*v.*
Boston Mill
Corporation.

Rust
*v.*
Boston Mill
Corpora-
tion.

1643, they must still be considered as the property of the town, till they released the same to the tenants in 1807, excepting such part as would, in the opinion of the jury, be considered as appurtenant to the ancient wharf of Paine and Adams for the use of shipping.

7. Because the verdict was against evidence, inasmuch as the bounds of the flats claimed by the tenants themselves, extended no further eastward than the mill stream, but the bounds, as fixed by the Court, gave the tenants a considerable extent of flats eastward of the mill stream.

*March 12th.*    *Sullivan* and *Nichols*, for the demandant. The colony law of 1641 (Anc. Charters, 148) provides, that, in all coves &c. where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to the low-water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further." The object of this is to fix the rights of the public, as opposed to those of the owners of the upland ; it does not ascertain the rights of such owners as between themselves. The legislature intend, that the owners of the upland, as a body, shall hold to low-water mark, &c. By the common law of this State, a person owning land on a cove may wharf out in front of his land ; and this ordinance will bear that construction. It does not say that such owner shall go to low-water mark in the nearest or any particular direction. There may be many points of low-water mark equally near to his upland. The abutters must own the cove according to the rules of the common law respecting fresh water coves, or they must go to a common passage way, so that each one may be accommodated. In the case of a triangular cove it may be right to go out towards low-water mark ; but in those of a different shape it would be impracticable. Suppose a cove to be in the form of the letter U ; according to the principle laid down at the trial, the proprietor of the up land at the bend would own all the flats. It would be improper to go obliquely to low-water mark, for then the owners would cross each other, which would produce confusion. Suppose there is an island in the cove ; must the owner of that part of it, which fronts on the channel, have flats, and the owners of the rest have none ? The ordinance relates to the

owners of the upland all round the cove, and it intends that the exterior lines of their flats shall be at right angles with the line of their upland. One object of the ordinance was to enable them to wharf out in front of their respective lots; but according to the construction given at the trial, those near the mouth of the cove would be debarred this privilege. *Commonwealth* v. *Charlestown*, 1 Pick. 183; *Storer* v. *Freeman*, 6 Mass. R. 438. They would have a right by the common law to embank in front of their upland. Angell on Tide Waters, 150.

On the point, that Simonds and others, by building the mill dam, had given a practical construction of the extent of the grant made to them by the town, the counsel cited *Jackson* v *Schoonmaker*, 7 Johns. R. 12; *Jackson* v. *Murray*, ibid. 10; — and as to the inadmissibility of the deed to Waldo and Cook, *Outram* v. *Morewood*, 5 T. R. 121; *Jackson* v. *Bard*, 4 Johns. R. 234.

*H. G. Otis* and *Minot*, for the tenants.

WILDE J. delivered the opinion of the Court. The lands demanded in this action were formerly flats, and the demandant claims them as appertaining to his adjoining upland, by virtue of the colony law of 1641. To establish his title, he proved at the trial, that soon after the first settlement of the country certain allotments were made to Thomas Buttolph, William Copp, and John Button, which included the upland now in the possession of the demandant.

These allotments were proved by an ancient book of records of the town of Boston, entitled the Book of Possessions, which, although not regularly authenticated, has been preserved among the records of the town, and as nothing appears to impeach its verity, we consider it as competent evidence, and as sufficient to establish these ancient titles. [1]

The demandant did not deduce a connected title from Copp and others. Yet as it was proved that he and those under whom he claims, had been in the possession of a part of the upland included in the ancient allotments above mentioned, claiming title thereto, ever since the year 1653, we are

Rust
*v.*
Boston Mill
Corporation.

*March 29th*

166

---

[1] See 1 Stark. Ev. (5th Am. ed.) 200 *et seq.*; 2 Harr. Dig. 1074, 1075

SUFFOLK AND NANTUCKET.

Rust
v.
Boston Mill
Corpora-
tion.

of opinion that such a long and undisturbed possession is sufficient to raise a presumption of a grant from the former owners. [1]

But no flats were included in these allotments, which were bounded, on the side of the cove, by the marsh ; so that all the flats, on this side, were necessarily excluded ; and cannot be now claimed as appurtenant to the upland, unless the allotments were made, as the demandant contends they were, previously to the ordinance of 1641. This question of fact has been submitted to the consideration of the jury, and the verdict would be conclusive, if the chief justice had not intimated to the jury that it was not material ; but as they might have been prevented from considering the matter by this intimation, there ought to be a new trial, provided the fact is material and was sufficiently proved by the evidence.

To prove the fact, the demandant, at the trial, relied on the Book of Possessions ; but there is nothing to be found in this book to fix the dates of the grants to Copp and others, or to show when their possessions commenced. But the presumption is strong, that they did not commence so early as to entitle them to the flats under the ordinance of 1641. In 1643, the town granted all the cove and all the salt marsh bordering thereupon round about, not formerly granted to any others, to Henry Simonds and others, under whom the tenants claim. The exception of former grants referred, no doubt, to grants made by the town.

It appears by the records of the town, that governor Winthrop and several distinguished citizens were present at the meeting when this grant was made. And it cannot be presumed that they were ignorant of the legal rights of the town ; or that they would have consented to the grant, unless they were satisfied as to the title. Nor can it be presumed that the grantees would have made the purchase, thereby engaging to incur the heavy expense of erecting mills, according to the terms and condition of the grant, without a thorough examination of the title of the grantors.

We find also, that soon after the grant, several proprietors

[1] See *Farrar* v. *Merrill*, 1 Greenl. 17; *Jackson* v. *Moore*, 6 Cowen, 706 *Jackson* v. *Dieffendorf*, 3 Johns. R. 269.

of upland bordering on the flats applied to the town for leave to wharf out before their lands. And among those thus applying, Thomas Broughton, under whom the demandant claims, was one, who applied for this purpose in 1652 and renewed his application in 1654. These facts raise very strong presumptions in favor of the ancient title of the town ; and we find no evidence in the case to repel them. We are therefore all of opinion, that there was no evidence at the trial which could have warranted a verdict on this point in favor of the demandant. But if the allotments to Copp and others had been made previous to the ordinance of 1641, it is by no means clear that they could have claimed the flats by virtue of that ordinance ; because there is marsh land in front of these allotments. This appears by the Book of Possessions ; and that there was marsh thereabout, appears also by the grant to Simonds and others, and by the explanation of that grant, in which it is declared that the grantees shall not be bound to reserve any marsh, if they should have occasion to cut it up, but in that case the town's liberty for repairing the causeway was to reach to such land as might be left, whether upper or nether spitt. If then there was marsh in front of the allotments to Copp and others, which was excluded by the terms of those allotments, they could not take the flats under the ordinance ; for the flats would belong to the proprietor of the adjoining land, whether upland or marsh.

This being our view of this part of the case, it is immaterial whether the construction given by the chief justice to the ordinance of 1641 was correct or not. For if the demandant has shown no title under the ordinance, the construction of it is unimportant. We however have no doubt of the correctness of the construction adopted at the trial. If the demandant were entitled to the flats, he could claim them only in the direction to low-water mark. This is the obvious meaning of the language of the ordinance. And it appears to me that the supposed difficulty of making a division of the cove among the several proprietors of the land adjoining, is without foundation. Let us suppose that a line drawn across the mouth of the cove were 100 rods in length ; and that the circular line of the cove at high-water mark were 200 rods in

length. Then each proprietor of a lot abutting on the cove would be entitled to run his lines from the two corners of his lot in a direction to low-water mark, so as to include a piece of flats which would be at the mouth of the cove one half of the width of the lot at high-water mark ; and thus by converging lines the whole cove might be divided without any intersecting lines.

Thus if there were only two proprietors of the land surrounding the cove, each holding a moiety in severalty, and their dividing line being at the centre of the head of the cove ; then a central line passing down to low-water mark would be the dividing line of the flats between the two proprietors. So if there were four proprietors, each owning an equal extent of front on the cove, then each would be entitled to a piece of flats 25 rods in width at the mouth of the cove, so that lines drawn from the corners of each lot at the front, in a direction to low-water mark, and being distant from each other at the mouth of the cove 25 rods, would give to each proprietor his due share of the flats in the cove, according to the terms of the ordinance of 1641. And this form of division will be practicable whatever may be the number of lots around the cove. Thus each proprietor may hold his share of the flats in severalty, subject to no other restrictions than those imposed by the ordinance, namely, that he shall not obstruct other proprietors in the enjoyment of their water privileges, by hindering the passage of boats, vessels, &c. In thus dividing flats in a cove or creek, we suppose that there is no natural channel within the cove, and that low-water mark is without the same. These facts seem to be satisfactorily proved in this case, for although it was attempted to be shown that there was a natural channel in the cove, yet the weight of the evidence is clearly opposed to such a supposition.

I am aware that coves and creeks may be so irregularly formed as to render this or any other mode of dividing the flats according to the ordinance difficult, if not impracticable ; but it is sufficient for the present, that such is not the form of the cove in question.[1]

---

[1] The mode adopted in Maine for ascertaining the side lines of water lots from the upland to low-water mark, under the colonial ordinance of 1641

The demandant, therefore, has wholly failed to establish his ancient and original title to the flats in question. In the first place, there is no sufficient evidence of the grant or allotment of the upland to Copp and others previous to the ordinance of 1641. In the second place, this allotment was bounded on the westerly side by marsh, which separated it from the flats, so that if it had been made previous to 1641, the flats would nevertheless belong to the proprietors of the marsh. And thirdly, if the demandant were entitled to the flats under the ordinance, he could not claim them in the direction of the exterior lines of his lot.

The next question to be considered is, whether the demandant's title by possession is sufficient to maintain his action. It appears that he and those under whom he claims have been in possession of the upland bordering on the cove, for more than a century. And in tracing his title, it also appears that flats have been claimed and conveyed as appurtenant to his lot ; and that he and those under whom he claims have entered on a part of the flats, have built a wharf thereon, and have used the flats adjacent for the accommodation of shipping and other purposes, during the whole or a greater part of that period.[2] Now the demandant's counsel contend, that by this entry and possession of a part of the flats, he and those under whom he claims became seised of the whole flats in front of his lot, according to his present claim. This may be true in regard to strangers or those not having a prior title ; it becomes necessary, therefore, to examine the title of the tenants, and to compare it with this possessory title on the part of the demandant.

---

where they have not been otherwise settled by the parties, is, to draw a base line from one corner of each lot to the other, at the margin of the upland, and run a line from each of these corners, at right angles with such base line, to low-water mark. If the line of the shore is straight, the side lines of the lots, thus drawn to low-water mark, will be identical ; but if by reason of the curvature of the shore, they either diverge from, or conflict with, each other, the land enclosed by both lines, or excluded, as the case may be, is to be equally divided between the adjoining proprietors. *Emerson* v. *Taylor*, 9 Greenl. R. 42. A plan is introduced into the above decision, by which the mode of division in such cases is illustrated. See *Deerfield* v. *Arms*, 17 Pick. 41.

[2] See *Brimmer* v. *Proprietors of Long Wharf*, 5 Pick (2nd ed.) 135, note 3

It has been already remarked, that a grant of the cove was made by the town of Boston to Simonds and others in the year 1643, and it was admitted at the trial, that the tenants have all the estate conveyed by that grant. The words of the grant are as follows : — " There is granted unto Henry Simonds, George Burden, John Button, John Hill, and their partners, all that cove (already bounded) on the northwest side of the causey leading from Charlestown, with all the salt marsh bordering thereupon round about, not formerly granted to any other ; reserving liberty from time to time to make use of any part thereof for repairing the said causey ; to have and to enjoy the said cove and marsh to them and their heirs and assigns for ever." By this grant the whole cove and marsh passed to the grantees in fee, unless the general words are restricted by the words " already bounded." When general words of description are made use of in a grant, no doubt they may be controlled and restricted by a reference to particular bounds. And it may be, that the words " already bounded " were intended at the time of the grant to have this effect. But the difficulty is, that there is no evidence whatever of the bounds referred to in the grant, and in absence of all proof of ancient bounds, the grant must operate according to the general description of the estate granted.

It has been argued, that the erection of the mill dam was a contemporaneous construction of the extent of the grant ; [1] and that we are to presume that the bounds referred to in the grant were at the place where this dam was erected. But there seems to be no ground for this presumption, for it is clear that more land was granted than was intended to be used for the accommodation of the mills ; as the grant includes a tract of land situated in Braintree. When words are used in a grant, which have a clear and definite meaning, they are not to be restrained by conjectures, or by other words, the meaning of which cannot be clearly ascertained. We are therefore necessarily brought to the conclusion, that the whole cove and marsh passed by the grant of the town, with the exception of prior grants.

---

[1] See *Choate* v. *Burnham*, 7 Pick. 274.

It was remarked in the argument, that no flats were grant‑ ed ; but the case shows that the whole cove consisted of flats, where the tide ebbed and flowed, low‑water mark being below the mouth of the cove, and there being no natural channel in any part of the cove.

It was remarked also, that the mill holders themselves have given a construction to their grant, by a long continued non‑ claim of the flats without the mill dam.   But the contrary we think plainly appears by the evidence reported.

It appears by the records of the proprietors, that they vo ed to erect a sea wall on the north side of the dam, to be filled with mud from the flats, of a sufficient height to prevent all tides from passing over.   It appears also, that in the year 1735, they granted a part of the flats outside the mill dam to Waldo and Cook, and it was admitted that the grantees entered and took possession, and that the land and flats con‑ veyed are now held under the grant.   The admission of this deed in evidence was objected to at the trial, but it was clearly legal evidence.   It was not a mere declaration or claim of the proprietors, (although it might have been ad‑ mitted, if thus considered, to repel a presumption founded on a non‑claim of the estate,) but it was an act done, and possession under the deed was, in some sense, the posses‑ sion of the proprietors, for the deed contains divers cove‑ nants and conditions in their favor, which rendered the deed and possession under it very proper evidence for the consider‑ ation of the jury.

There were other acts of possession proved on the part of the mill holders, which it is unnecessary to notice particularly, as it is very clear that the proprietors of the cove never did abandon any part of the flats in controversy.

We are therefore of opinion, that the whole cove and salt marsh passed from the town to Simonds and others in the year 1643, and that the tenants are lawfully seised under that title, except as to that part which the demandant, and those under whom he claims, have gained by disseisin ; as to which the jury have found in his favor.   In regard to the residue, it cannot be maintained that any one has had an exclusive pos‑ session, so that as to that part the seisin follows the legal title.

Rust
*v.*
Boston Mill
Corpora-
tion.

If therefore the flats without the mill dam did not pass to Simonds and others in the year 1643, the town continued seised thereof until the year 1807, when it was released to the tenants. So that on either ground the tenants are clearly entitled to the flats in controversy.

*Judgment according to verdict.*